**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| CANTRELLA DAWSON, | CASE NO. 4:22-CV-00304 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **<u>MEMORANDUM OPINION AND ORDER</u>** |
| Defendant. | |

Plaintiff Cantrella Dawson ("Plaintiff" or "Ms. Dawson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF Doc. 8.) For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## I.    Procedural History

Ms. Dawson filed her SSI and DIB applications on January 29, 2020. (Tr. 15, 53-54, 167-75.) She asserted a disability onset date of January 20, 2020. (Tr. 15, 167, 169.) She alleged she was disabled due to diabetes, depression, bipolar manic, anxiety, and panic attacks. (Tr. 55, 71, 90, 102, 197.) Her applications were denied at the initial level (Tr. 86-95) and upon reconsideration (Tr. 98-105). She requested a hearing (Tr. 111-12), which was held before an Administrative Law Judge ("ALJ") on November 13, 2020 (Tr. 28-52).

The ALJ issued a decision on December 4, 2020, finding Ms. Dawson had not been under a disability within the meaning of the Social Security Act from January 20, 2020, through the date of the decision.  (Tr. 12-27.)  Ms. Dawson requested review of the decision by the Appeals Council.  (Tr. 164-66.)  The Appeals Council denied her request for review on December 23, 2021, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  The case has been fully briefed and is ready for review.  (ECF Docs. 7, 9, 10.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Dawson was born in 1972.  (Tr. 35, 55.)  She has a high school education.  (Tr. 36, 198.)  She previously worked as a housekeeper in residential surgical hospital facilities.  (Tr. 37-39.)  She stopped working in 2019.  (Tr. 39-40.)

### B.     Medical Evidence

#### 1.     Relevant Treatment History

##### i.     Mental Health Treatment History

On March 9, 2020, Ms. Dawson presented to Liberty PsyCare for an adult diagnostic evaluation conducted by Michael J. Prystash, MS Ed LPCC.  (Tr. 333-40.)  She complained of diminished appetite and energy, and inconsistent sleep cycle.  (Tr. 333.)  She also complained of panic attacks, reporting that her first one occurred a month earlier, and reported an isolated instance of suicidal ideation that occurred five months earlier.  (*Id*.)  She also reported a history of irritability, mood swings, and isolation.  (*Id*.)  She said she had a "tendency to 'keep things balled up inside.'" (*Id*.)  She reported walking away from a job she had worked at for three years in January 2020.  (*Id*.)  On mental status examination, she was adequately groomed and dressed casually.  (Tr. 334.)  She was alert and oriented to time, place, and person.  (*Id*.)  She

comprehended questions and provided relevant responses. (*Id*.) The volume of her speech was overly soft, but her speech was a normal rate and she articulated adequately. (*Id*.) She had racing but logical thoughts with no signs of psychosis or worry. (*Id*.) She was moderately depressed, mildly anxious, and defensive, but was also cooperative with good eye contact and appropriate behavior. (*Id*.) Her intelligence was average, and her insight and judgment were good. (*Id*.) Mr. Prystash recommended individual counseling two to three times per month and a psychiatric evaluation. (Tr. 339.)

Ms. Dawson returned to Mr. Prystash on April 9, 2020, for a telehealth psychotherapy session, reporting that she was in a new home and was no longer displaced. (Tr. 402.) She reported receiving assistance from family, staying "socially and behavi[o]rally active," and that she was managing her stress. (*Id*.) She reported "initial insomnia due to being up thinking about stuff." (*Id*.) On mental status examination, she was mildly depressed and anxious, but she was cooperative, her speech was adequately articulated, and her thoughts were organized with no signs of psychosis. (*Id*.) Her appearance, motor activity, and affect were not observed. (*Id*.)

Ms. Dawson had two additional telehealth therapy sessions with Mr. Prystash in April 2020. (Tr. 405-07, 408-10.) On April 17, she reported she had been outside walking the dog and working on managing her stress level. (Tr. 405.) She reported not liking her new home and having a hard time sleeping due to anxiety and having an air mattress. (*Id*.) On mental status examination, she was mildly depressed, but she was cooperative, her speech was adequately articulated, and her thoughts were goal-directed and logical with no signs of psychosis. (*Id*.) Her appearance, motor activity, and affect were not observed. (*Id*.) On April 27, Ms. Dawson again reported she had been outside walking the dog and working on managing her stress level.

(Tr. 408.)  However, she also reported instances of being angry due to stress.  (*Id*.)  Examination findings were similar to prior sessions.  (*Compare* Tr. 408 *with* Tr. 405, 402.)

Ms. Dawson presented to Brenda Ritz, MSN, CNS at Liberty PsyCare on April 21, 2020, for a psychiatric diagnostic evaluation conducted via a telehealth appointment.  (Tr. 341.)  She reported symptoms of depression, sadness, fatigue, insomnia with difficulty falling asleep, irritability, anxiety, and social withdrawal.  (*Id*.)  On examination, Ms. Dawson was moderately depressed and mildly irritable.  (Tr. 343.)  Her examination findings were otherwise normal, including normal speech, a friendly demeanor with good eye contact, normal motor activity, logical thoughts with no signs of psychosis, normal attention and concentration, good judgment and insight, adequate comprehension, and a fund of knowledge within normal limits.  (*Id*.)  CNS Ritz diagnosed major depressive disorder recurrent severe and unspecified anxiety disorder, and prescribed citalopram.  (*Id*.)

Ms. Dawson reported during a May 11, 2020, telehealth therapy session with Mr. Prystash that she was still not sleeping well because she only had an air mattress.  (Tr. 411.)  Examination findings were unchanged from her prior visit.  (*Compare* Tr. 411 *with* Tr. 408.)  She did not attend her telehealth therapy session on May 21, 2020, but returned to Mr. Prystash for therapy on June 29, 2020.  (Tr. 414, 415.)  She continued to report poor sleep due to sleeping on an air mattress.  (Tr. 415.)  She also reported feeling depressed but said she had been more social with her family, her irritability had decreased, and her "medicine [was] helping."  (*Id*.)

When Ms. Dawson saw Mr. Prystash on July 13, 2020, for telehealth therapy, she said she had a "good week and good day."  (Tr. 424.)  She reported going to the store with her daughter and sister.  (*Id*.)  She had been doing yardwork and had a good night of sleep one night that week.  (*Id*.)  On examination, she continued to appear mildly depressed, but she was

4

cooperative, and her thoughts were goal-directed and logical with no signs of psychosis.  (Tr. 424-25.)

Ms. Dawson returned to CNS Ritz on July 20, 2020, for a telehealth medication management visit.  (Tr. 430-31.)  Ms. Dawson described her anxiety and insomnia as mild and her depression as moderate.  (Tr. 430.)  She reported her appetite was improved.  (*Id*.)  On examination, she was moderately depressed with a mildly anxious mood.  (Tr. 431.)  Her examination findings were otherwise normal, including normal speech, cooperative and appropriate behavior, normal motor activity, logical thoughts with no signs of psychosis, normal attention and concentration, good judgment and insight, adequate comprehension, and her fund of knowledge was within normal limits.  (*Id*.)  CNS Ritz continued to diagnose major depressive disorder recurrent severe and unspecified anxiety disorder.  (*Id*.)  She increased Ms. Dawson's citalopram to twice per day.  (Tr. 430, 431.)

During a July 31, 2020 telehealth therapy session, Ms. Dawson reported being "depressed lately" due to her living situation and still having to sleep on an air mattress.  (Tr. 427.)  She reported that she tried looking for a job but stopped after losing motivation and becoming frustrated and irritated.  (*Id*.)  She reported "going off on people."  (*Id*.)  She reported that she was not improving overall but did "have good days and sometimes good weeks."  (*Id*.)  She reported some "initial insomnia."  (*Id*.)  She said she was not eating properly even though she knew she needed to because of her diabetes.  (*Id*.)  Her mood was observed to be "severely depressed" on examination, but she continued to present with a cooperative behavior and her thoughts were goal-directed and logical with no signs of psychosis.  (Tr. 427-28.)  Ms. Dawson reported that she was continuing to work on stress mitigation.  (Tr. 429.)  Mr. Prystash noted that she was "[e]ngaging, participated, [and] appear[ed] motivated to make change."  (Tr. 429.)

Ms. Dawson cancelled a session with CNS Ritz on August 17, 2020, stating she forgot that she also had an appointment at the same time with her primary care physician.  (Tr. 433.) She met with CNS Ritz on August 19, 2020, for a telehealth medication management visit.  (Tr. 434.)  She described her anxiety, depression, and insomnia as mild.  (*Id*.)  Examination findings were normal, except she was noted to be mildly anxious and mildly depressed.  (Tr. 435.)  CNS Ritz continued her prescription for citalopram.  (*Id*.)

Ms. Dawson met with Mr. Prystash on August 26, 2020, for telehealth therapy.  (Tr. 457.) She reported that she was doing "pretty good," but also said she had a "rough week," explaining that they had to go to "eviction court" and she had a "'bad meltdown [two] days ago' getting irritated and 'getting in one of [her] moods.'"  (*Id*.)  However, she also said she was able to work out a payment plan and her daughter's work hours had increased.  (*Id*.)  She planned to go for a ride with her daughter and to a donut shop.  (*Id*.)  Mr. Prystash again observed that her mood was "severely depressed," but that she continued to present with a cooperative behavior and her thoughts were goal-directed and logical with no signs of psychosis.  (Tr. 457-58.)

Ms. Dawson did not attend her September 3, 2020, therapy session.  (Tr. 460.)  She returned on September 28, 2020, reporting she had been evicted.  (Tr. 461.)  She had stayed in a motel for a short time but was in the process of moving to her sister's home.  (*Id*.)  Examination findings were unchanged from August 2020.  (*Compare* Tr. 461 *with* Tr. 457.)  Mr. Prystash observed that she continued "to struggle with depression," but was "[e]ngaging, maintaining a positive attitude and following plan of action getting herself out of motel."  (Tr. 463.)

### ii. Physical Impairment Treatment History

Ms. Dawson presented to Mallory Ucchino, D.O. at MercyHealth on August 28, 2019, to establish as a new patient.  (Tr. 257-74.)  She complained of numbness and tingling in her feet

6

that had been occurring for several months. (Tr. 262.)  Her examination findings were normal. (Tr. 265.)  Dr. Ucchino ordered bloodwork to assess whether her complaints were related to a back injury, diabetes, or another cause.  (Tr. 264-65.)  Ms. Dawson returned the next day to review her lab results.  (Tr. 275.)  Dr. Ucchino diagnosed type 2 diabetes mellitus with hyperglycemia.  (Tr. 279.)  Dr. Ucchino prescribed insulin and metformin, provided diet education, and instructed her to check and track her blood sugar each morning.  (*Id*.)  Dr. Ucchino also diagnosed polyneuropathy related to diabetes.  (Tr. 279-80.)

Ms. Dawson returned to Dr. Ucchino on September 26, 2019, reporting that she felt significantly better than before.  (Tr. 297.)  Her fasting blood sugars ranged from 100 to 150. (*Id*.)  Dr. Ucchino noted that Ms. Dawson was newly diagnosed diabetic and indicated: "The patient has evidence of end organ damage including peripheral neuropathy.  She does not see a Podiatrist for foot care. Last eye exam was unknown."  (*Id*.)   Physical examination findings were normal.  (Tr. 300.)

Ms. Dawson returned to Dr. Ucchino on November 26, 2019, for follow up regarding her diabetes, neuropathy, and Vitamin D deficiency.  (Tr. 311.)  Her fasting blood sugars ranged from 100-140 and her recent HgA1c was 7.8%, which Dr. Ucchino noted was significantly improved from a prior value of 15.3%.  (*Id*.)  Ms. Dawson reported that she was walking at the mall and watching her diet.  (Tr. 316.)  Dr. Ucchino again noted: "The patient has evidence of end organ damage including peripheral neuropathy. She does not see a Podiatrist for foot care." (Tr. 311.)  Dr. Uchhino also noted that her last eye examination had occurred that year.  (*Id*.) Examination findings were normal.  (Tr. 314.)  Dr. Ucchino indicated that Ms. Dawson's polyneuropathy was stable, her Vitamin D deficiency was improving but still low, and her

elevated alkaline phosphatase level was improved.  (Tr. 316.)  She recommended follow up in about three months.  (*Id*.)

Ms. Dawson returned to Dr. Ucchino on March 3, 2020.  (Tr. 325.)  Dr. Ucchino restated in the history section that Ms. Dawson had "evidence of end organ damage including peripheral neuropathy," she did "not see a Podiatrist for foot care," and her last eye examination "was this year through America's Best." (*Id*.)  Ms. Dawson's diabetic foot examination showed: no skin lesions, no edema, normal sensation, normal pulses, and intact pinprick and proprioception.  (*Id*.) Other physical examination findings were also normal.  (Tr. 328-29.)  Ms. Dawson asked Dr. Ucchino how long she would have to be on insulin.  (Tr. 330.)  Dr. Ucchino advised her that she was due for repeat lab work, and they would make a decision regarding insulin based on her A1c test results.  (*Id*.)

Ms. Dawson returned to Dr. Ucchino on July 21, 2020, for follow up.  (Tr. 450.)  Dr. Ucchino noted that Ms. Dawson's HgA1c had improved significantly, noting that her most recent value was 6.3% in March 2020 in contrast to prior values of 7.8% and 15.3%.  (*Id*.)  Dr. Ucchino noted again in the history section that Ms. Dawson had "evidence of end organ damage including peripheral neuropathy," she did "not see a Podiatrist for foot care," and her last eye examination "was this year through America's Best."  (*Id*.)   Ms. Dawson reported a rash / small bump on her fingertips and some swelling around her left eye with itching and watering.  (*Id*.) Dr. Ucchino noted the presence of a rash on Ms. Dawson's fingertips during her examination. (Tr. 454.)  Examination findings were otherwise normal.  (Tr. 453-54.)  Dr. Ucchino indicated that Ms. Dawson's diabetes was significantly improved and "now controlled" with current use of low doses of insulin, and her polyneuropathy was stable.  (Tr. 455.)  She prescribed a steroid cream for the rash, which she said was consistent with eczema.  (*Id*.)

2.      **Opinion Evidence**

i.      **Treating Mental Health Provider**

CNS Ritz completed a Mental Impairment Questionnaire on October 20, 2020.  (Tr. 254-55.)  She indicated that Ms. Dawson had been diagnosed with major depressive disorder recurrent episode severe and unspecified anxiety disorder; she was prescribed Celexa, which caused her nausea.  (Tr. 254.)  CNS Ritz listed the following clinical findings as evidence of the severity of Ms. Dawson's impairments and symptoms: mildly anxious and mildly depressed. (*Id*.)  She opined that Ms. Dawson's prognosis was fair.  (*Id*.)   She opined that Ms. Dawson had "limited but satisfactory" ability to:

- carry out very short and simple instructions;

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- perform at a consistent pace without an unreasonable number and length of rest periods;

- remember locations and work-like procedures;

- understand and remember very short and simple instructions; and

- ask simple questions or request assistance.

(Tr. 254-55.)  She also opined that Ms. Dawson was "seriously limited, but not precluded" in her ability to:

- perform activities within a schedule;

- manage regular attendance and be punctual within customary tolerances;

- sustain an ordinary routine without special supervision;

- work in coordination with or in proximity to others without being distracted by them;

9

- complete a normal workday and workweek without interruptions from psychologically based symptoms;

- understand and remember detailed instructions;

- interact appropriately with the general public;

- accept instructions and respond appropriately to criticism from supervisors;

- get along with coworkers or peers without districting them or exhibiting behavioral extremes;

- respond appropriately to changes in the work setting;

- be aware of normal hazards and take appropriate precautions; and

- set realistic goals or make plans independently of others.

(*Id*.)  CNS Ritz also opined that Ms. Dawson would miss two days of work per month due to her mental impairments and be off task for thirty minutes per day.  (Tr. 255.)

### ii.     State Agency Psychological Consultants

State agency psychological consultant Kristen Haskins, Psy. D., completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment on May 5, 2020.  (Tr. 57-59.)  She opined in the PRT that Ms. Dawson had: no limitations in her ability to understand, remember, or apply information; mild limitations in her ability to interact with others and concentrate, persist, or maintain pace; and moderate limitations in her ability to adapt or manage herself.  (Tr. 57.)  She opined that Ms. Dawson had the mental RFC to work in an environment where duties were fairly static with no stringent time or production demands.  (Tr. 59.)

State agency psychological consultant Paul Tangeman, Ph.D., affirmed Dr. Haskin's opinions on reconsideration on July 17, 2020. (Tr. 73-76.)  Dr. Tangeman acknowledged that Ms. Dawson might still be experiencing mental health symptoms, but opined that his review of the evidence supported adoption Dr. Haskin's initial findings.  (Tr. 76.)

10

iii.        **State Agency Medical Consultants**

State agency medical consultant Dana Schultz, M.D., reviewed the medical evidence, including evidence of diabetes on May 5, 2020.  (Tr. 56-57.)  She opined that Ms. Dawson did not have a severe physical impairment.  (*Id*.)

State agency medical consultant Mehr Siddiqui, M.D., affirmed Dr. Schultz's findings on reconsideration on July 20, 2020.  (Tr. 73.)  He explained that he found Dr. Shultz's finding of no severe physical impairment was supported because Ms. Dawson's examinations were essentially normal, even though she reported ongoing leg pain and the evidence showed diabetes and Vitamin D deficiency.  (*Id*.)

**C.    Function Reports**

**1.    Plaintiff's Function Report**

Ms. Dawson stated in a Function Report completed on May 4, 2020 (Tr. 208-15) that she had depression, it was hard for her to work and be around people, and she wanted to be alone (Tr. 208).  She said she did not like to go outside because she was afraid she would have an anxiety attack.  (Tr. 210.)  She reported seeing a counselor every other week and taking citalopram for depression.  (Tr. 215.)

**2.    Third-Party Function Report**

Ms. Dawson's daughter completed a Third-Party Function Report on October 7, 2020. (Tr. 244-51.)  She said it was impossible for her mother to work because she did not get along with people.  (Tr. 244.)  She had to make her mother wake up, and said she was lucky if she was able to get her to take a shower.  (Tr. 245.)  She had to provide her mother with reminders all the time and had to prepare food for her.  (Tr. 246.)  She said her mother had stopped going out and doing activities; she stayed at home or in her room.  (Tr. 249.)  She said that her mother would

occasionally go for a ride with her if she made her go, and that she had to accompany her mother places.  (Tr. 247-48.)

D.    **Hearing Testimony**

1.    **Plaintiff's Testimony**

Ms. Dawson testified in response to questioning by the ALJ and her representative at the November 13, 2020, hearing.  (Tr. 35-47.)  She was living with her sister and daughter.  (Tr. 35.) She reported that she and her daughter were evicted and living in a motel for a while before they moved in with her sister.  (Tr. 47.)  She had her driver's license, but she said she did not drive because she had panic attacks when she drove.  (Tr. 36.)

Ms. Dawson reported walking away from her job of three years in 2019, saying: "I just couldn't take it, just have a nervous breakdown and panic attack and everything, I just walked away from everything."  (Tr. 39-40.)  She said being around people caused her to have a panic attack and made her nervous.  (Tr. 40, 43-44.)  The ALJ noted that she had been at the job for three years and asked her if she had always had a problem being around people.  (Tr. 40.)  Ms. Dawson said: "I always had it and I just got tired, and it just came up on me."  (*Id*.)  She reported that her panic attacks lasted fifteen to twenty minutes and occurred about three times a week.  (Tr. 43-44.)  She said that her chest got "real tight," she could not breathe, she cried, and she got nervous when she was having a panic attack.  (Tr. 44.)

Ms. Dawson said that she suffered from severe depression, explaining that she could not get out of bed most days due to her depression.  (Tr. 41.)  She said that her sister and daughter had to make her get up, get dressed, wash up, take her pills, and eat.  (*Id*.)  She said she showered once a week and did not change her clothes regularly.  (*Id*.)  She reported problems falling asleep, concentrating, and following instructions.  (Tr. 41-42.)  She said she had crying spells at

least four times a day.  (Tr. 43.)  She said a trigger for her crying spells was not being left alone.

(*Id*.)  She explained:

> I just want to be left alone and then they keep on reminding me to do stuff and I
> don't want to do it and then something just come over me and I just have a little
> attack and start crying and be angry and everything, I just want to be left alone.

(*Id*.)  She said that she had recently talked with her medical provider about her panic attacks, and

her prescription was increased.  (Tr. 47.)

Ms. Dawson said she did not consistently check her blood sugar levels, saying "I just

don't want to it."  (Tr. 44.)  She also did not take her diabetes medicine on a consistent basis, but

said that her blood sugar levels were okay when she did take her medication.  (Tr. 44-45.)  She

did not socialize with anyone other than her sister and daughter.  (Tr. 46.)  She said that she

typically spent her day sleeping in a dark room.  (Tr. 45.)  She did not cook, perform household

chores, shop, or leave her house.  (Tr. 45-46.)  She acknowledged telling her counselor she

walked her daughter's dog sometimes, but said she only did so if she took her medicine and was

motivated.  (Tr. 46-47.)

### 2.      Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 47-52.)   He described Ms.

Dawson's prior hospital housekeeper position as an unskilled job, performed by her at the

medium exertional level.  (Tr. 48.)

The ALJ asked the VE whether a hypothetical individual of Ms. Dawson's age, education

and work experience could perform her past work if the individual could perform work at all

exertional levels, but was limited as follows:

> able to perform simple, routine tasks in a work environment where there are no
> tasks that involve high production quotas or fast paced production demands; and
> also where there's only occasional interaction with coworkers and the public, but
> where there are no work tasks that involve customer service duties, confrontation,

conflict resolution, directing of work of others or persuading others; and . . . also should be a work environment where there are only occasional changes in workplace tasks or duties, with any such changes being gradually introduced and explained in advance.

(Tr. 49.)  The VE testified that the described individual could perform Ms. Dawson's past work and there were other jobs that the individual could perform, including floor waxer, an unskilled medium job, and marker and router, unskilled light jobs.  (Tr. 49-50.)  He testified that no jobs would be available if the individual described in the initial hypothetical also required an isolated work environment.  (Tr. 50.)  He testified that there would be no jobs if the individual would either be off task 15% or absent more than two days a month.  (Tr. 50-51.)  Finally, the VE testified that there would be no jobs available if the individual required redirection to perform job tasks up to one-third of the workday.  (Tr. 51.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

14

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her December 4, 2020, the ALJ made the following findings:[2]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.  (Tr. 17.)

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

2.      The claimant has not engaged in substantial gainful activity since January 20, 2020, the alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: major depressive disorder and anxiety disorder.  (Tr. 17-18.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18-19.)

5.      The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: limited to performing simple routine tasks in a work environment where there are no tasks that involve high production quotas or fast-paced production demands, there is only occasional interaction with co-workers and the public, where there are no work tasks involving customer service duties, confrontation, conflict resolution, directing the work of others, or persuading others, and where there are only occasional changes in the workplace tasks or duties with any such changes being gradually introduced and explained in advance.  (Tr. 19-22.)

6.      The claimant can perform past relevant work as a hospital housekeeper because the work does not require the performance of work-related activities precluded by her residual functional capacity.  (Tr. 22.)

Based on the foregoing, the ALJ determined that Ms. Dawson had not been under a disability, as defined in the Social Security Act, from January 20, 2020, through the date of the decision.  (Tr. 22.)

## V.      Plaintiff's Arguments

Ms. Dawson challenges the constitutional authority of the Commissioner to decide her case, and raises substantive objections to the ALJ's decision as follows:

1.      The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.  (ECF Doc. 7, pp. 1, 8-11; ECF Doc. 10, pp. 3-9.)

2.      The ALJ committed harmful error when her RFC failed to include the limitations as set forth by the treating certified nurse practitioner, and when she failed to find at Step Two of the Sequential Evaluation that Ms. Dawson's

16

diabetes and associated neuropathy was a severe impairment.  (ECF Doc. 7, pp. 1, 11-17; ECF Doc. 10, pp. 1-3.)

3. The ALJ erred when she failed to find that the waxing and waning of Ms. Dawson's psychological symptoms would preclude her from engaging in substantial gainful activity on a full-time sustained basis.  (ECF Doc. 7, pp. 1, 17-22.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

17

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.** **First Assignment of Error: Whether Ms. Dawson Has Standing to Challenge ALJ Decision Based on Alleged Separation of Powers Violation by the Commissioner**

Ms. Dawson argues that the ALJ decision here is "constitutionally defective" because the appointment of the former Commissioner of Social Security violated separation of powers principles. (ECF Doc. 7, pp. 1, 8-11; ECF Doc. 10, pp. 3-9.) Specifically, she argues based on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, ⸺ U.S. ⸺, 140 S. Ct. 2183, 207 L.Ed.2d 494 (2020) that the statute under which the former Commissioner was appointed violated separation of powers principles by allowing him to serve a longer term than the President of the United States while protecting him from removal except for cause, similar to the statute found unconstitutional in *Seila Law*. (ECF Doc. 7, pp. 8-9 (challenging 42 U.S.C. § 902(a)(3)).) Ms.

Dawson argues based on this precedent that the ALJ's authority to issue the decision in this case was "constitutionally defective" because her authority was delegated from the Commissioner, and because the ALJ's decision was improperly based on regulations promulgated by the former Commissioner without authority.  (ECF Doc. 7 pp. 1, 8-11; ECF Doc. 10, pp. 3-9.)

The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause" (ECF Doc. 9, p. 9 (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)), but argues that Ms. Dawson is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused her harm." (*Id.* (citing *Collins v. Yellen*, ⸺ U.S. ⸺, 141 S. Ct. 1761, 1787-89, 210 L.Ed.2d 432 (2021)).)  More specifically, the Commissioner argues that Ms. Dawson cannot show harm to support her claim for relief because she cannot show that the removal restriction caused the denial of her benefits.  (ECF Doc. 9, pp. 9-13.)  The Commissioner notes that "courts around the country[] have considered arguments similar to Plaintiff's argument here and have repeatedly denied relief."  (ECF Doc. 9, p. 9 & p. 12, n. 4 (collecting cases).)

Having considered the arguments of the parties and the applicable law, the undersigned agrees with other courts that Ms. Dawson's constitutional challenge to a statutory removal provision for the Commissioner of Social Security suffers from a fundamental deficiency in this individual Social Security disability appeal, namely that Ms. Dawson lacks standing to assert the challenge.[3]  *See Kutyba v. Comm'r of Soc. Sec. Admin.*, No. 5:22-CV-00483-CEH, 2023 WL

---

[3] The Commissioner also argues that Ms. Dawson's request for relief under *Seila Law* fails under other legal and equitable doctrines, including harmless error, de facto officer, the rule of necessity, and broad prudential

1438853, at *8 (N.D. Ohio Jan. 31, 2023); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021); *Rhouma v. Comm'r of Soc. Sec.*, 575 F.Supp.3d 904, 917-18 (N.D. Ohio 2021); *Catherine J.S.W. v. Comm'r of Soc. Sec.*, No. 3:20-cv-5602-TLF, 2021 WL 5276522, at *8 (W.D. Wash. Nov. 12, 2021); *Melvin S. v. Comm'r of Soc. Sec.*, No. 20-5978, 2021 WL 6072564, at *11 (W.D. Wash. Dec. 22, 2021); *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021); *Cooper v. Saul*, No. 21-CV-38-CJW-MAR, 2021 WL 2908112, at *2 (N.D. Iowa July 9, 2021).

Standing is a threshold issue, and a failure to establish standing means a court cannot address the merits of a claim. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the case").  Although the Commissioner did not directly challenge Ms. Dawson's standing in this case, this Court has the ability and the obligation to raise the issue of standing *sua sponte* where it is in doubt.  *See Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.").  Indeed, "[a]s a jurisdictional requirement, standing ... cannot be waived or forfeited." *Virginia House of Delegates v. Bethune-Hill*, ––– U.S. ––––, 139 S. Ct. 1945, 1951, 204 L.Ed.2d 305 (2019).  Moreover, it is noted that the primary defect challenged by the Commissioner in her briefing – that Ms. Dawson did not suffer actual harm caused by the statutory removal provision – is also a key element of the standing analysis discussed herein. (ECF Doc. 9, pp. 9-13.) *See also Rhouma*, 575 F.Supp.3d at 917-18 (raising standing *sua sponte* when "the Commissioner doesn't use the word 'standing,' [but] argues that [the plaintiff] has not

---

considerations.  (ECF Doc. 9, pp. 14-17.)  Because the undersigned concludes that this Court does not have standing to hear the relevant constitutional arguments, these additional arguments are not addressed herein.

established a 'nexus' between § 902(a)(3)'s removal restrictions and an alleged harm," and "has effectively argued that [the plaintiff] has not met the traceability requirement for standing").

As explained in *Collins*, Ms. Dawson must satisfy a three-pronged test to establish Article III standing, namely: "[she] must show that [she] has suffered an 'injury in fact' that is 'fairly traceable' to the defendant's conduct and would likely be 'redressed by a favorable decision.'" 141 S. Ct. at 1779 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, (1992)); *see also Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001); *Gerber v. Herskovitz*, 14 F.4th 500, 505 (6th Cir. 2021).

Under the second "traceability" prong, the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [she] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void." 141 S. Ct. at 1788, n. 24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protection for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S.Ct. at 2196 (("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))). However, the Court explicitly clarified that this "holding on standing does not mean that actions taken by such an officer are void *ab initio* and must be undone." 141 S. Ct. at 1788, n. 24.

As the party invoking federal jurisdiction in this case, Ms. Dawson bears the burden of establishing standing for each claim and form of relief. *See Loren*, 505 F.3d at 607 (citing *Lujan*, 504 U.S. at 561 (1992)); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Ms.

21

Dawson contends that the requirements for standing are met because the Commissioner did not argue otherwise, and for the reasons set forth in two district court cases addressing similar constitutional challenges.  (ECF Doc. 10, p. 3 (citing *Brinkman v. Kijakazi*, No.  2:21-CV-00528-EJY, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, No. 5:21-CV-076-M-BQ, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted*, No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021).)  Given that standing cannot be waived or forfeited, the pertinent question is whether Ms. Dawson has successfully demonstrated that the "traceability" requirement is met in this case.

The court in *Brinkman* did face a similar challenge to an ALJ decision based on the alleged unconstitutionality of the statutory removal provision for the Commissioner of Social Security under *Seila Law*.  2021 WL 4462897, at *1.  And contrary to the argument offered by Ms. Dawson in this case, the *Brinkman* court held: "Plaintiff cannot establish traceability. Because Plaintiff cannot demonstrate traceability, she lacks standing to bring her constitutional challenge."  *Id.* at *2 (emphasis added).  Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing."  *Id.* (citing *Seila Law*, 140 S.Ct. at 2196 and *Collins*, 141 S.Ct. at 1779).  This case clearly does not support a finding that Ms. Dawson has demonstrated standing to pursue her constitutional claim in this case.

In contrast, the court in *Sylvia* found the "traceability" requirement was met for a similar challenge "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3. In so finding, the court relied in part on another court's observation that "[i]f the removal

22

protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate." *Id.* (quoting *Tafoya v. Kijakazi*, 551 F.Supp.3d 1054, 1061 (D. Colo. 2021)).  Indeed, the *Tafoya* court went on to state: "Under those conditions, the ALJs themselves ostensibly are operating without constitutional authority, and their disability determinations – which again, are the decisions of the Commissioner – arguably are null." *Tafoya*, 551 F.Supp.3d at 1061.

Consistent with the findings in *Sylvia* and *Tafoya*, Ms. Dawson asserts that the ALJ decision here was "constitutionally defective" because the ALJ's authority was delegated by the Commissioner.  (ECF Doc. 7, pp. 8-10; ECF Doc. 10, p. 4.)  In other words, she contends that the ALJ lacked authority to issue the present decision because the Commissioner lacked the ability to delegate that authority to her.  However, such a finding is in direct conflict with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office."  141 S. Ct. at 1788 n. 23 (citing *Seila Law*, 140 S.Ct. at 2207-2211).  The *Collins* Court explained because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer, but "there was no constitutional defect in the statutorily prescribed method of appointment to that office," there was accordingly "no reason to regard any of the actions taken by the [agency] … as void."  *Id.* at 1787 (emphasis in original).  In so finding, the Court distinguished prior separation of powers decisions involving "a Government actor's exercise of power that the actor did not lawfully possess," including the holding in *Lucia v. S.E.C.*, 138 S. Ct. 2044 (2018) that certain administrative law judges were appointed in violation of Appointments Clause.  *Id.* at 1788 (citations omitted).  Thus, the Court distinguished the impact

23

of an unlawful appointment clause – as in *Lucia* – from an unlawful removal clause – as in *Seila Law*, *Collins*, and the present case.

Based on the Supreme Court's explicit findings in *Collins*, there is no legal basis for the undersigned to conclude that actions of the SSA Commissioner or the ALJ in this case were automatically void or lacking in authority.  Thus, the determination must return to the question whether Ms. Dawson was "harmed by an action that was taken by [the SSA Commissioner] and that [she] alleges was void."  *Collins*, 141 S. Ct. at 1788, n. 24.  Ms. Dawson's arguments on this point are underdeveloped, as she has given no argument or explanation as to how the identified actions by the Commissioner are traceable to any harm suffered in the present case.  She points to no specific policy and/or regulatory changes implemented by the former Commissioner that adversely affected her.  *See Lujan*, 504 U.S. at 559 n.1 ("[T]he injury must affect the plaintiff in a personal and individual way.").  Even assuming *arguendo* that the former Commissioner took actions that "undermined and politicized Social Security disability benefits" (ECF Doc. 10, p. 5), Ms. Dawson has not identified specific harm resulting from his actions.  *See e.g.*, *Baumiller v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-01782, 2022 WL 4140248, at *7 (N.D. Ohio Sept. 13, 2022) (finding "nothing in the administrative record of proceedings in [claimant's] case provide[d] evidence that any of the bias, maladministration, or politicization of which she complain[ed] infected the adjudication of her claim").

Consistent with the findings of other courts, the undersigned therefore concludes that Ms. Dawson has failed to establish that she has suffered harm traceable to an unlawful action by the former Commissioner of Social Security, and has accordingly failed to establish standing to pursue this constitutional challenge.  *See, e.g., Rhouma*,  575 F.Supp.3d at 918 ("Without a harm traceable to an unlawful action by the Commissioner, [plaintiff] does not have standing to

challenge the constitutionality of § 902(a)(3).”); *Catherine J.S.W.*, 2021 WL 5276522 at *8 ("Because Plaintiff has not shown any compensable harm fairly traceable to the actions of former Commissioner Saul, under *Collins v. Yellin,* 594 S. Ct. 1761,1788 (2021), the Plaintiff's situation is distinguishable from the plaintiff's claims in *Collins*; Plaintiff has failed to establish standing and the Court need not address the Plaintiff's or Defendant's additional arguments.”); *Helms*, 2021 WL 5710096 at *3 ("The Court finds that it is implausible that the Commissioner's protection from removal from office, whether constitutional or not, could have affected ALJ Goodson's decision or any other aspect of the administrative litigation in a material way. Because Plaintiff has not shown that she was in any way injured by the removal protection provision, she does not have standing to litigate its constitutionality.”).

Based on the foregoing, the Court concludes that Ms. Dawson does not have standing to proceed with her separation of powers constitutional claim.

**C.      Second Assignment of Error: Whether ALJ Erred in Evaluating Treating Nurse Opinion or in Her Step Two Determination**

Ms. Dawson's second assignment of error contains two unrelated arguments.  First, she argues that the ALJ did not properly evaluate the opinion of her treating mental health provider CNS Ritz.  (ECF Doc. 7, pp. 11-15; ECF Doc. 10, pp. 1-3.)  Second, she argues that the ALJ erred at Step Two when she concluded that diabetes was not a severe impairment.  (ECF Doc. 7, pp. 15-17.)  The Court addresses each of these arguments below.

**1.      Whether ALJ Properly Evaluated CNS Ritz's Opinion**

Ms. Dawson contends the ALJ erred in finding CNS Ritz's opinion unpersuasive.  (ECF Doc. 7, pp. 11-15; ECF Doc. 10, pp. 1-3.)  The Commissioner responds that the ALJ properly evaluated CNS Ritz's opinion under the operative regulations (ECF Doc. 9, pp. 17-20)

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

Here, the ALJ analyzed the persuasiveness of CNS Ritz's opinion as follows:

I have fully considered the medical opinions and prior administrative medical findings as follows: at Exhibit 14E, the claimant's treating therapist Brenda Ritz,

26

MSN, CNS, noted that the claimant is mildly anxious and mildly depressed. She noted that the claimant has limitations in concentration, persistence and pace; understanding and memory; social interaction; and adaptation. She concluded that the claimant would be absent two days per month due to her impairments/treatment and be off-task during the workday for 30 minutes []. I find the practitioner's opinion unpersuasive. While the record supports limitations in the claimant's functional domains (as discussed above), Ms. Ritz notes herself that the claimant's depression and anxiety are "mild in nature." Moreover, mental health treatment notes rate the claimant's depression and anxiety as 'moderate' to 'mild' []. In addition, Ms. Ritz does not adequately explain the ratings given in the functional domains. She does not provide examples of the claimant's limitations or state the claimant's allegations and how the claimant's treatment supports limiting in her functioning in the manner Ms. Ritz determined.

(Tr. 21 (emphasis added) (citations omitted).)

Ms. Dawson argues in a general manner that her "treating records, combined with the testimony and written statements supported and were consistent with [CNS Ritz's] opinion which the ALJ erroneously found unpersuasive." (ECF Doc. 7, p. 15.)  She asserts that "[t]he ALJ's rationale failed to view the entire record, . . . and note the multiple problems [she] had related to her major depressive disorder and generalized anxiety disorder." (*Id*.)  More particularly, she argues: (1) the ALJ's analysis of CNS Ritz's opinion was faulty because the ALJ's finding that CNS Ritz herself noted Ms. Dawson's "depression and anxiety were mild in nature . . . is contrary to the evidence from PsyCare" (ECF Doc. 7, pp. 12-13); and (2) "the ALJ cited to only four treatment records to support [her] conclusion" that CNS Ritz's opinion was unpersuasive (ECF Doc. 10, p. 1).  The Court considers these arguments below.

### i.    Whether ALJ Relied on Findings Contrary to the Evidence

Ms. Dawson first argues the ALJ's analysis was faulty because her observation that CNS Ritz "note[d] herself that the [Ms. Dawson's] depression and anxiety [were] 'mild in nature" was in fact "contrary to the evidence from PsyCare."  (ECF Doc. 7, pp. 12-13.)

The Court finds no merit to this argument.  In support of her observation that CNS Ritz herself noted Ms. Dawson's depression and anxiety to be "mild in nature," the ALJ cited to the medical opinion itself, which relied on the following clinical findings: "mildly anxious, mildly depressed."  (Tr. 21 (citing Tr. 254-55).)  This was not an erroneous characterization of the record.  In support of her observation that Ms. Dawson's mental health treatments notes rated her depression and anxiety as "moderate" to "mild," the ALJ cited to:

- March 2020 examination findings from Ms. Dawson's therapist, noting that her mood was "moderately depressed and mildly anxious" (*id.* (citing Tr. 379, 395));

- Ms. Dawson's own July 2020 report to CNS Ritz that her anxiety was mild and her depression was of moderate severity (*id.* (citing Tr. 430)); and

- Ms. Dawson's own August 2020 report to CNS Ritz that her anxiety and depression were both of mild severity (*id.* (citing Tr. 434)).

This also was not an erroneous characterization of the PsyCare records.  Indeed, the Court finds the record generally supports the ALJ's observation that Ms. Dawson's examination findings, including those recorded by CNS Ritz and her psychotherapist, reflected findings of mild to moderate anxiety and/or depression.  (*See, e.g.,* Tr. 343, 379, 402, 405, 424, 431, 435.)

However, Ms. Dawson correctly observes that her therapist noted on a few occasions that she was "severely depressed," in August and September 2020.  (ECF Doc. 7, pp. 13-14 (citing Tr. 457, 461).)  The question thus becomes whether these notations of "severe" depression within the context of Ms. Dawson's treatment records as a whole render the ALJ's characterization of the records inaccurate or deprive the ALJ's findings of the support of substantial evidence.  The Court finds that they do not.

It is well-established that the ALJ was not required to discuss all evidence of record in support of her findings.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (holding an ALJ is not "required to discuss each piece of data in [her] opinion, so long

as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion") (citing

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).

While the ALJ did not specifically note that Ms. Dawson's psychotherapist observed

"severe depression" at certain psychotherapy sessions, she did discuss the relevant therapy

records, as follows:

> In August 2020, the claimant reported having a rough week due to her eviction case,
> but doing well overall, going for a ride with her daughter, and going to Dunkin'
> Donuts (9F/1). Her therapist observed that the claimant was "engaging, maintaining
> a positive attitude and following plan of action getting herself out of motel," though
> she struggles with depression (9F/7).

(Tr. 21 (citing Tr. 457, 463.)  Thus, although the ALJ did not highlight Mr. Prystash's

observation of severe depression at those sessions, she did specifically document the additional

situational stressors occurring at the time.  The medical records further reflect that Ms. Dawson's

therapist observed at those same sessions that she remained cooperative, her thought process was

goal directed and logical, and she was engaged, positive, and motivated to take action necessary

to improve her situation.  (Tr. 457, 459, 461, 463).[4]

Given that the cited findings of "severe" depression differed from most mental status

findings of record, were limited in time, occurred in the context of a significant life stressor

(eviction) that was acknowledged by the ALJ, and were made by a provider other than CNS Ritz,

the Court finds the ALJ did not mischaracterize the record or ignore material evidence when she

observed in support of her persuasiveness finding that Ms. Dawson's mental health treatment

records rated her depression and anxiety as "'moderate' to 'mild.'"  (Tr. 21.)

---

[4] Although not cited by Plaintiff, the Court notes that Mr. Prystash also noted severe depression on July 31, 2020.
(Tr. 428.)  That treatment record contained similar mental status findings and therapist observations. (Tr. 427-29.)

### ii.    Whether ALJ Failed to Consider Entire Record When Assessing Persuasiveness of CNS Ritz's Opinion

Ms. Dawson also argues that the ALJ's persuasiveness determination was in error because "[t]he ALJ's rationale failed to view the entire record" (ECF Doc. 7, p. 15), asserting that the "ALJ cited to only four treatment records to support [her] conclusion" that CNS Ritz's opinion was unpersuasive (ECF Doc. 10, p. 1).  The Court finds no merit to this contention.

To articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion."  *Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507–08).  An ALJ is also permitted to rely on previously articulated information to support her opinion analysis.  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Here, while it is true that the ALJ did not detail each medical treatment record, a review of her ALJ decision reveals that she did not ignore Ms. Dawson's mental health treatment history.  On the contrary, she provided the following substantive discussion of medical and non-medical evidence before she discussed the opinion evidence:

> The record shows that on March 9, 2020, the claimant visited her treating therapist complaining of diminished appetite, decreased energy, inconsistent sleep cycle, and past suicidal ideations. The claimant reported that she lives with her adult daughter and maintains contact with her son. On examination, the claimant was average build, adequately groomed and casually dressed. The claimant understood questions asked, was alert and gave relevant responses. She was oriented for time, place and person. The claimant had overly soft speech volume, but adequately articulated her words and at a normal rate. The claimant's fund of knowledge was average and within normal limits. The claimant had racing thoughts and logical thought content, but there were no signs/symptoms of psychosis and worry. The claimant exhibited good insight and judgement. Her mood was moderately depressed and mildly anxious, with consistent affect. Lastly, her eye contact was appropriate yet defensive. Overall, she was cooperative and polite [].

30

The following April 21, 2020, the claimant visited her treating nurse practitioner complaining of depression, sadness, fatigue, insomnia, irritability, anxiety, and social withdrawal. On examination, she appeared moderately overweight, well-groomed and casually dressed. The claimant's mood was moderately depressed and mildly irritable. Her affect was consistent with her mood. The claimant's speech was articulate with normal volume and rate. The claimant's behavior was friendly and appropriate; she made good eye contact. The claimant exhibited good judgement and insight. The claimant had logical thought content. Her mood was moderately depressed and mildly anxious. The claimant's fund of knowledge and intelligence are good and within normal limits []. In August 2020, the claimant reported having a rough week due to her eviction case, but doing well overall, going for a ride with her daughter, and going to Dunkin' Donuts []. Her therapist observed that the claimant was "engaging, maintaining a positive attitude and following plan of action getting herself out of motel," though she struggles with depression [].

Despite her hearing testimony, there are no ongoing reports of panic attacks and self-isolating, particularly nothing beyond the first treatment note in March 2020 and, after that, we see her reports that the medicine helping and her irritability decreased []. She completed yardwork and shopping []. Her difficulty sleeping, at first, appeared in the setting of untreated mental health impairments; after treatment stabilized her, she reported difficulty sleeping when using an air mattress[]. Moreover, the claimant's mental status examinations, with the exception of notations regarding her mood, are unremarkable. The claimant's memory, attention and concentration, thought content, insight, and judgement are within normal limits. She is alert, appropriate and with a good fund of knowledge [].

(Tr. 20-21 (citations omitted).)  Thus, it is clear that the ALJ considered more than four treatment records in support of her opinion analysis.

Instead of pointing out specific evidence that the ALJ failed to appropriately address in her opinion analysis, Ms. Dawson provides a recitation of evidentiary findings that appear to be copied and pasted verbatim in three separate sections of her brief, and again nearly verbatim in her reply brief.  (ECF Doc. 7, pp. 3-4, 13-14, 17-18; ECF Doc. 10, pp. 1-2.)  This recitation of evidentiary findings unsupported by developed argument need not be addressed by this Court.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Accordingly, the Court finds that the ALJ's opinion analysis was supported by

31

substantial evidence and based on a review of the whole record, and further finds that Ms. Dawson has not met her burden to prove otherwise.

As to Ms. Dawson's general assertion that the ALJ "failed to adequately explain her findings regarding the supportability, consistency, and persuasiveness of the treating source," the Court finds that this generalized argument lacks support. As to supportability, the ALJ noted that CNS Ritz characterized Ms. Dawson's anxiety and depression as mild, and further observed that she did not "provide examples of the claimant's limitations or state the claimant's allegations and how the claimant's treatment supports limiting in her functioning in the manner [CNS] Ritz determined." (Tr. 21.) As to consistency, the ALJ accurately observed that Ms. Dawson's treatment records generally described her depression as moderate to mild. (*Id.*)

Ultimately, Ms. Dawson is arguing that the ALJ erred because "[t]he treating records, combined with the testimony and written statements supported and were consistent with" CNS Ritz's opinion. (ECF Doc. 7, p. 15.) This argument mistakes the question before this Court. Even if a preponderance of evidence supported Ms. Dawson's argument, this Court cannot overturn the ALJ's persuasiveness finding "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406. To second-guess the ALJ's persuasiveness finding in this case would ultimately interfere with the recognized "'zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).

For the reasons set forth above, the Court finds the ALJ's assessment of CNS Ritz's opinion was adequately articulated and supported by substantial evidence.

### 2.    Whether ALJ Properly Found Diabetes Was Not a Severe Impairment

Ms. Dawson next argues that the ALJ erred at Step Two when she concluded that diabetes was not a severe impairment.  (ECF Doc. 7, pp. 15-17.)  In response, the Commissioner argues that the ALJ's finding that diabetes was not a severe impairment is supported by substantial evidence.  (ECF Doc. 9, pp. 23-24.)

### i.    Analysis for Step Two Determinations

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Human Svcs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330-32 (6th Cir. 2001).

The Sixth Circuit has construed Step Two as a *de minimis* hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985)).  Although the standard is *de minimis*, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

33

In this case, the ALJ discussed Ms. Dawson's diabetes and said she had "considered all of [Ms. Dawson's] medically determinable impairments, including those that are not severe, when assessing [her] residual functional capacity." (Tr. 18.) She went on to conclude that the evidence did not support a finding that Ms. Dawson's diabetes "had more than minimal impact on [her] activity performance or ability to conduct herself throughout the day" (*id.*), and adopted an RFC without any exertional limitations (Tr. 19).

The question thus becomes whether the ALJ's finding that Ms. Dawson's diabetes was not a severe physical impairment was supported by substantial evidence, i.e., "more than a scintilla of evidence but less than a preponderance" and "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion." *Besaw*, 966 F.2d at 1030.

### ii. Whether Substantial Evidence Supported Finding That Diabetes Was Non-Severe and Caused No Functional Limitations

When giving her rationale for finding Ms. Dawson's diabetes to be a non-severe impairment, the ALJ explained:

> The record shows medical diagnosis of type-2 diabetes mellitus . . . . However, the record does not show that [this] impairment[] had more than minimal impact on the claimant's activity performance or ability to conduct herself throughout the day. For instance, <u>the claimant's treatment notes show that she complained of pain in her legs and feet and after starting appropriate medication for diabetes, the pain ceased</u>.

(Tr. 18 (citations omitted) (emphasis added).)

Ms. Dawson argues the ALJ's observation that her "pain ceased after starting appropriate medication" was incorrect because the ALJ was citing medical records from two appointments in 2019, when records from later appointments in 2020 noted "evidence of end organ damage including peripheral neuropathy" and her "diagnosis of diabetic neuropathy was repeated on July 21, 2020." (ECF Doc. 7, pp. 15-16.) She contends that the ALJ erred because "the medical evidence documented . . . peripheral neuropathy related to her diabetes" and her "neuropathy . . .

34

had more than a minimal impact on her ability to function." (*Id*. at p. 16.)  She makes this argument, however, without explaining what specific evidence (beyond the diagnosis itself) proved her diabetes and related peripheral neuropathy caused more than minimal functional limitations in her ability to perform work-related tasks.

While Ms. Dawson is correct that her medical records note "end organ damage including peripheral neuropathy" (Tr. 325, 443), this diagnosis alone "says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863.  Certainly, the ALJ did not base her Step Two findings on the lack of a diagnosis.  Instead, she observed that Ms. Dawson had initially complained of "pain in her legs and feet" caused by her diabetes, but that "the pain ceased" after Ms. Dawson started appropriate medication to treat her diabetes.  (Tr. 18.)  Consistent with this observation, the medical records reflect the following:

- In August 2019, Ms. Dawson complained of numbness and tingling in her feet, had normal physical examination findings, was diagnosed with type 2 diabetes mellitus and polyneuropathy related to diabetes, and was started on insulin and metformin (Tr. 262, 265, 278-80);

- In September 2019, Ms. Dawson reported feeling significantly better than before, her fasting blood sugars ranged from 100 to 150 and appeared well controlled, her excessive thirst had resolved since starting insulin and metformin, her energy had improved, her physical examination findings remained normal (Tr. 297, 300-02);

- In November 2019, Ms. Dawson's fasting blood sugars ranged from 100 to 140, her most recent HgA1c was 7.8%, significantly improved from 15.3% in August, her physical examination findings remained normal, she reported feeling well and walking to the mall, and her polyneuropathy was noted to be stable (Tr. 311, 314-16);

- In March 2020, Ms. Dawson's physical and diabetic foot examination findings remained normal, and she questioned how long she would have to be on insulin (Tr. 325, 328-30); and

- In July 2020, medical records indicate Ms. Dawson's HgA1c had improved to 6.3% in March, physical examination findings remained normal except for a rash consistent with eczema, and her diabetes was significantly improved and "now controlled" with low doses of insulin, while her polyneuropathy remained stable (Tr. 450, 453-55).

These clinical observations and medical findings are consistent with the ALJ's finding that Ms. Dawson's reported symptoms from her diabetes and associated neuropathy had resolved with appropriate medication.  (Tr. 18.)  The mere fact that Ms. Dawson's medical providers continued to mark the existence of her peripheral neuropathy does not change this fact.

Taken together, the record contains substantial evidence to support the ALJ's finding that Ms. Dawson's diabetes and related symptoms improved with appropriate treatment.  (Tr. 18.) Moreover, the ALJ's finding that Ms. Dawson's diabetes was non-severe was further supported by the opinions of the state agency medical consultants, who considered the medical evidence relating to her diabetes in May and July 2020 and nevertheless concluded that her diabetes was not a severe physical impairment.  (Tr. 57, 73.)  The ALJ appropriately considered these opinions when assessing Ms. Dawson's RFC.  (Tr. 22.)

Although Ms. Dawson has the burden at Step Two to demonstrate the severity of her diabetes, she points to no clinical findings or medical opinion evidence documenting more than minimal functional limitations relating to her diabetes or peripheral neuropathy.  Nor does she explain in her brief how either condition specifically limits her physical functional abilities.  She states only in a conclusory manner: "[T]he medical evidence documented the fact that Dawson had peripheral neuropathy related to her diabetes. Neuropathy which had more than a minimal impact on her ability to function."  (ECF Doc. 7, p. 16.)

For the reasons set forth above, the Court finds Ms. Dawson has not met her burden to show that the ALJ's finding that her diabetes was not a severe impairment lacked the support of substantial evidence.

**D.      Third Assignment of Error: Whether ALJ Erred in Evaluating Subjective Complaints Relating to Mental Impairments**

In her third assignment of error, Ms. Dawson argues that the ALJ erred by failing to recognize that her mental health symptoms waxed and waned, thus causing serious limitations in her ability to interact with others and adapt or manage herself.  (ECF Doc. 7, 17-22.)  The Commissioner responds that the ALJ properly considered evidence regarding Ms. Dawson's mental health conditions, including her subjective reports, and that her mental RFC assessment is supported by substantial evidence.  (ECF Doc. 9, pp. 20-22.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.")(citing *Jones*, 336 F.3d at 476); see also 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462,

49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 20), so the discussion will be focused on the ALJ's compliance with the second step.

The question before the Court is whether the record contains substantial evidence to support the ALJ's evaluation of Ms. Dawson's subjective symptoms.  Factors relevant to this analysis include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).  Here, a review of the ALJ decision reveals that she considered the entire record, based her findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.

At Step Two, the ALJ acknowledged and concluded that Ms. Dawson had severe impairments of major depressive disorder and anxiety disorder.  (Tr. 17.)  At Step Three, the ALJ evaluated whether her mental health impairments met or equaled a listing and concluded that they did not.  (Tr. 18-19.)  The ALJ found: no limitations in understanding, remembering, or applying information; mild limitations in concentrating, persisting or maintaining pace; and moderate limitations in social interaction and adapting or managing oneself.  (*Id*.)  Ms. Dawson argues that the evidence supports greater than moderate limitations in the areas of social interaction and adapting and managing herself.  (ECF Doc. 7, pp. 19, 21.)  She contends that the ALJ improperly based her finding of moderate limitations in these areas on evidence showing that she: was able to provide and answer questions from medical providers; had a good rapport with providers; and appeared comfortable during appointments (*id*. at p. 19).

Ms. Dawson first argues that it was improper for the ALJ to rely on the cited evidence to support her findings because she failed to note that the appointments were telehealth

appointments due to Covid.  (*Id*.)  Whether her appointments were in person or telehealth

sessions, Ms. Dawson was still required to interact with others during those appointments.  The

Court finds that the ALJ's consideration of the extent to which she was able to interact with

others and respond to medical providers was not improper or inconsistent with the ALJ's

obligation to weigh and consider the evidence of record.

Next, Ms. Dawson argues that the telehealth appointments themselves provided support

for her testimony that she could not be around people.  (ECF Doc. 7, p. 19.)  The Court finds this

argument without merit.  There is no evidence to suggest that Ms. Dawson's counseling sessions

were conducted as telehealth appointments because she could not leave her house or interact with

others in person.  Indeed, Ms. Dawson herself acknowledges that her "appointments were over

the phone <u>due to Covid</u>."  (ECF Doc. 7, p. 19 (emphasis added).)

As part of her Step Four analysis, the ALJ acknowledged Ms. Dawson's subjective

statements regarding her symptoms, stating:

> At the hearing, the claimant testified to being depressed and in bed 7 days a week,
> that her daughter and sister have to make her get up to get dressed, washed and
> remind her to take pills. She testified she does not sleep well at night and that she
> sleeps all day. She testified she cannot concentrate well at all, does not watch TV
> or read. She sits in her room. She testified that she needs reminders and has crying
> and angry spells four times a day. She stated that she wants to be left alone, has no
> hobbies, no interests. She testified to panic attacks three times a week-with chest
> tightness and difficulty breathing. She stated that her depression makes her not feel
> like even checking her diabetes. Lastly, she stated that she does not cook, vacuum,
> do dishes or laundry and does not shop.

(Tr. 20.)  The ALJ ultimately concluded that Ms. Dawson's "statements concerning the intensity,

persistence and limiting effects of [her] symptoms are not entirely consistent with the medical

evidence and other evidence in the record for the reasons explained in this decision."  (*Id*.)  (Tr.

23.)  In support of this finding, she explained: "As for the claimant's statements about the

intensity, persistence, and limiting effects of his or her symptoms, <u>they are inconsistent because</u>

the record shows sparse mental health treatment with no changes in her condition since the State

Agency rendered its decision at the reconsideration level." (*Id*. (emphasis added).)  The ALJ

proceeded to detail Ms. Dawson's mental health treatment records, including examination

findings.  (Tr. 20-21.)  She explained further:

> Despite her hearing testimony, there are no ongoing reports of panic attacks and
> self-isolating, particularly nothing beyond the first treatment note in March 2020
> and, after that, we see her reports that the medicine helping and her irritability
> decreased []. She completed yardwork and shopping []. Her difficulty sleeping, at
> first, appeared in the setting of untreated mental health impairments; after treatment
> stabilized her, she reported difficulty sleeping when using an air mattress [].
> Moreover, the claimant's mental status examinations, with the exception of
> notations regarding her mood, are unremarkable. The claimant's memory, attention
> and concentration, thought content, insight, and judgement are within normal
> limits. She is alert, appropriate and with a good fund of knowledge [].

(Tr. 21 (citations omitted).)

Ms. Dawson argues that "the ALJ's conclusion that there were no ongoing reports of self-

isolating" was contrary to evidence that "established [her] continuing reports."  (ECF Doc. 7, p.

21.)  The evidence she details however is her <u>own</u> testimony and statements made in a functional

report.  (ECF Doc. 7, pp. 19-20.)  She does not point to ongoing reports to treatment providers of

panic attacks and self-isolating behavior.  Even so, the ALJ did consider and account for her

reports of self-isolating behavior.  Specifically, when explaining that she found the opinions of

the state agency psychological consultants them somewhat persuasive, she stated:

> [T]he State Agency consultants concluded that she does not have limitations in
> understanding and memory or in social interactions, but that she can work in an
> environment where duties are fairly static and there are no stringent time or
> production demands (3A/4A; 7A/8A). I find the State Agency opinion somewhat
> persuasive for the following reasons . . . <u>while the State Agency determined that</u>
> <u>the claimant does not have limitations in her social interactions, due to her hearing</u>
> <u>testimony—reports of isolating, irritability and problems being around others at</u>
> <u>work—she has moderate limitations in social interactions</u>. All other limitations are
> consistent with the record, and adopted in the assigned residual functional capacity.

(Tr. 22 (emphasis added).)  The ALJ did not ignore her subjective symptoms.  Instead, the ALJ accounted for those symptoms that she found supported by the evidence, concluding that Ms. Dawson had the mental RFC to:

> perform[] simple routine tasks in a work environment where there are no tasks that involve high production quotas or fastpaced production demands, there is only occasional interaction with co-workers and the public, where there are no work tasks involving customer service duties, confrontation, conflict resolution, directing the work of others, or persuading others, and where there are only occasional changes in workplace tasks or duties with any such changes being gradually introduced and explained in advance.

(Tr. 19.)

Ms. Dawson also claims that the ALJ "failed to take into account . . . records . . . which reflected [her] difficulties when she was feeling unstable, with increased depression and anxiety" and failed "to account for the variability" or "waxing and waning" of her symptoms.  (ECF Doc. 7, p. 22.)  However, as Ms. Dawson acknowledges, the ALJ observed that there was evidence that she struggled with her symptoms.  (ECF Doc. 7, p. 21; Tr. 21.)  Nevertheless, the ALJ explained that she found the evidence supported a finding that "overall [she] benefit[ed] from consistent treatment and psychotropic medication."  (Tr. 21.)

Ms. Dawson cites to *Keyse v. Saul*, No. 1:19-CV-02495-DAR, 2021 WL 1214691 (N.D. Ohio Mar. 31, 2021) in support of her claim that the ALJ did not properly consider the waxing and waning of her symptoms.  (ECF Doc. 7, pp. 21-22.)  The finding in *Keyse* is inapposite. There, the court remanded a case where the ALJ had failed to appropriately consider an opinion by a treating provider in light of two earlier opinions that were likely authored by the same provider.  *Keyse*, 2021 WL 1214691, at *20.  No such argument is before this Court.

As a whole, the Court finds the ALJ sufficiently addressed Ms. Dawson's mental health history and subjective allegations.  Again, it is not this Court's role to consider the evidence *de*

*novo*.  While Ms. Dawson disagrees with the ALJ's evaluation of her subjective allegations and contends that her symptoms were completely disabling, the ALJ's analysis was properly based on the entirety of the record, provided specific reasons for the weight given to the subjective allegations, was consistent with and supported by the evidence, and was clearly articulated so that the undersigned could assess how Ms. Dawson's symptoms were evaluated.

For the reasons stated above, based on the decision and the record before this Court, the Court finds that the ALJ properly considered and weighed the evidence and did not err in her evaluation of Ms. Dawson's subjective allegations.  Ms. Dawson has not shown that the evidence supports greater mental functional limitations than those contained in the mental RFC.

## VII.    Conclusion

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

October 13, 2023

/s/*Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge